1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| B. VEASLEY, a minor, by and through her Guardian ad Litem, RODNEY VEASLEY; and MILDRED VEASLEY, | CASE NO. 12-cv-3053-WQH-WVG |
| | ORDER |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

HAYES, Judge:

The matter before the Court is the Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. Plaintiffs bring this action for medical negligence against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-2680.[1] On October 27, 2015, the Court held a nine-day bench trial, at which it heard testimony and received exhibits.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I. Factual Background**

    **A. Placement of Intrauterine Device**

In April 2008, Mildred Veasley ("Veasley") delivered her second child in Japan, where her husband Rodney Veasley was stationed as an active duty United States

---

[1] The Complaint contains a claim for negligent infliction of emotional distress. No party addressed this claim during trial or in post-trial briefing. The Court considers Plaintiffs' negligent infliction of emotional distress abandoned at this stage in the proceedings.

Marine.  In or around June 2008, Rodney Veasley's duty station was changed from Japan to Camp Pendleton, California.

On July 31, 2008, Veasley had an appointment at the Naval Hospital Camp Pendleton ("NHCP") with Dr. Jennifer Almy, a NHCP family practice physician. During the month before the appointment, Veasley testified that she and Rodney were using condoms to avoid becoming pregnant.  At her appointment, Veasley told the health care providers that her last menstrual period ("LMP") began on July 16, 2008. Dr. Almy counseled Veasley on various types of birth control and Veasley decided that she wanted to have a Mirena IUD inserted.  Veasley testified that she scheduled an appointment to have an IUD inserted.  Veasley testified that Dr. Almy told her to avoid sexual relations for two weeks prior to the IUD placement.  Veasley testified that she followed those instruction and that the last time she had sexual intercourse was "the day or two before the window that [she] was not suppose to have intercourse."  (ECF No. 102 at 7:4-17).  Veasley testified that Dr. Almy told her that an IUD should not be inserted if she was pregnant.

At trial, Dr. Almy testified that she had no recollection of Veasley and could only testify regarding the content of her notes and her normal practice.  Dr. Almy testified that she would tell patients "to be abstinent or use condoms until the actual appointment for the IUD" during pre-counseling.  (ECF No. 92 at 56:16-20).

On September 9, 2008, Veasley returned to NHCP to have the IUD inserted. During that appointment, Veasley was not menstruating and she reported that her LMP began on August 12, 2008.  Veasley testified that she thought that she might be pregnant at that appointment.  Veasley testified that during that appointment no one asked her about her sexual activity between her  appointment on July 31, 2008 and the current appointment.

Before the IUD insertion, Veasley took a One Step urine pregnancy test and the results were negative.  Veasley testified that based on that pregnancy test, she believed she was not pregnant.  Dr. Almy then inserted the IUD.  Dr. Almy testified that she

"would have been reasonably ensured that a negative [urine pregnancy test] would have been a true negative." (ECF No. 92 at 48:16-19). Dr. Almy explained that, "for Ms. Veasley, I had looked at her prior cycles, and she had been 27 days approximate, so on day 29 when she had come to see me, I would have expected that if there was a pregnancy there would have been a positive [urine pregnancy test], and there was a negative [urine pregnancy test]." *Id*. at 57:3-13. Dr. Almy testified that she was aware that the manufacturer's recommendation as set forth in the Mirena IUD package insert dated July 31, 2008, provided that "Mirena is inserted . . . into the uterine cavity within 7 days of the onset of menstruation . . . ." *Id*. at 29:5-7. Dr. Almy testified that it was her custom and practice to "schedule [a patient's] appointment to be at the expected time of the [menstrual] cycle starting." *Id.* at 56:10-11. Dr. Almy testified that the possibility of insertion of an IUD in the presence of an existing undetermined pregnancy is reduced if insertion is performed within seven days of the onset of a menstrual period.

Dr. Almy testified that she was aware that pregnancy or suspicion of pregnancy was an absolute contraindication to inserting the Mirena IUD when she inserted the IUD. Dr. Almy testified that she did not ask Veasley about her sexual activity between the previous appointment and the current appointment before inserting the IUD:

> Q.   [Plaintiffs' counsel]: Dr. Almy, wouldn't the easiest way to find that out in each and every case so that you could be as certain as possible be to ask the patient as part of your routine history, when was the last time you [had] sex? And then the follow-up question to that would be, did you use any protection?
>
> A.   [Dr. Almy]: I would say in my pre-counseling that would have been done.
>
> Q.   I am not asking about your pre-counseling. I am asking about your custom and practice as of the date of insertion. Wouldn't the safest practice for you to have been to ask the patient pointblank, when was the last time you had sex, and if so, did you use protection?
>
> A.   I did not ask those questions, but I do ask prior to insertion if they have any questions or concerns prior to starting, and I consent them, and that is part of my practice.

. . . .

Q.   [A]s a physician you would have believed it was medically reasonable to ask Mrs. Veasley on September 9th when she had last had sex and did they use protection; correct?

A.   No, because I would have -- as I stated previously, I would have been -- I would have told them to have been using something because they did not desire to have a pregnancy.

*Id*. at 51:3-16; 52:8-14.  In response to a hypothetical scenario of a patient who was scheduled to have an IUD inserted on September 9, who stated that her LMP was August 12, and that she had sexual intercourse on August 23 or 24, Dr. Almy testified that she "would have postponed" the IUD insertion.  *Id*. at 50:23-51:16.

After the IUD insertion, Dr. Almy told Veasley how to vaginally check for the strings attached to the IUD to make sure it was properly placed, and that she should check the strings periodically.  Approximately two weeks after the IUD was inserted, Veasley checked to see if she could feel the strings from her IUD, but she could not feel them.

**B. Medical Treatment During the Early Pregnancy**

On October 30, 2008, Veasley made an appointment at NHCP because she could not feel her IUD strings and her stomach was getting bigger.  On October 31, 2008, Veasley was seen by Dr. Chrisanna Johnson who determined that Veasley was pregnant.  Dr. Johnson did not see any IUD strings coming from Veasley's cervix and did not see an IUD in Veasley's uterus during an ultrasound examination.  Dr. Johnson told Veasley that the IUD could have been expelled, but that it may still be in her uterus.  Dr. Johnson told Veasley that regardless of whether the IUD was still present, no attempt to remove the IUD should be made because of the risk of miscarriage.

On November 12, 2008, Veasley was seen by Family Practitioner Dr. Elizabeth Beazley at NHCP for her initial obstetrical visit.  Veasley told Dr. Beazley that her LMP

began on August 15, 2008,[2] which was recorded in her medical records.  Dr. Beazley indicated on Veasley's "Obstetrical Problem Sheet" that Veasley had a possibly retained IUD which should be monitored.  On November 24, 2008, Veasley received an obstetrical ultrasound to monitor fetal growth and to determine if the IUD was present.  Attending radiologist Dr. Harold Nadel reported that no IUD was visualized, and that the fetus was without obvious anomaly at an estimated gestational age of fifteen weeks and one day.

### C. Treatment of Mildred Veasley's Cramping and Vaginal Bleeding

On January 11, 2009, at approximately 3:00 a.m., Veasley went to the NHCP's Labor and Delivery Unit ("LDU") complaining of cramping that began the previous evening.  During that visit, Veasley was seen by Dr. Ivorique Hambrick, a family practice resident.  Veasley's examination revealed that the "external [cervical] os appear[ed] closed."  (Ex. 10 at 2).  No bleeding or contractions were reported or observed.  Dr. Hambrick wrote an assessment and plan in the medical record which Dr. Beazley edited.  At the conclusion of the visit, Veasley was discharged with precautions regarding the warnings signs of preterm labor.[3]  Veasley was told to follow up with Dr. Beazley in four weeks, or to return to the LDU sooner if there were problems.

On January 12, 2009, at approximately 3:00 a.m., Veasley returned to the LDU complaining of episodes of vaginal bleeding and cramping.  She was seen by Dr. Darin Rolfe, a family practice resident.  The attending physician, Dr. David Lifset, an obstetrician, signed off on the note Dr. Rolfe wrote in the medical record.  The note

---

[2] The medical record from Veasley's visit on September 9, 2008, indicate that her last menstrual period was August 12, 2008.  The medical record from  Veasley's appointment on November 12, 2008 indicate that her last menstrual period was August 15, 2008.

[3] Expert witnesses, Dr. Albert Phillips and Dr. Jessica Kingston, defined preterm labor as labor that occurs before week thirty-seven of a pregnancy.  Dr. Phillips testified that preterm labor also "indicates regular uterine contractions that are causing the progressive cervical thinning and opening of the cervix."  (ECF No. 107 at 47:19-21).  Dr. Kingston testified that to be defined as being in preterm labor a patient needs to demonstrate cervical changes such as "cervical shortening or effacement and/or cervical dilation."  (ECF No. 93 at 35:14-16).

stated that fetal monitoring revealed uterine contractions, but that the cervix remained "closed" and "long" after several hours of observation. (Exhibit 12 at 4). The doctors ruled out infection, or emergent placental problems such as placenta previa[4] or placental abruption[5]. The note stated that Veasley "has a history of having had an IUD placed and found out that she was pregnant when she was 3 months along." *Id*. at 5. The note stated that Veasley "was given strict precaution to return to [the LDU] or the [emergency department] for any future [vaginal] bleeding or pelvic cramping. [Preterm labor] precautions also given." *Id*. at 4. At the conclusion of the visit, Veasley was discharged.

On January 12, 2009 at approximately 6:28 p.m., Veasley called the LDU and stated that she had experienced cramping for a few hours, which were resolved by a gush of blood. Veasley spoke to Nurse Gillian Alvarez, who noted in the medical record that she discussed the case with Dr. Nicole Sharkey, an obstetrician, and Certified Nurse Midwife Bridget Moran. Alvarez instructed Veasley to call if there was any further bleeding or worsening in the cramping, and to rest and hydrate.

Approximately four hours later, at around 10:08 p.m., Veasley presented to the LDU complaining of vaginal bleeding and lower abdominal cramping. Veasley stated that around 7:00 p.m., she had experienced bleeding. The medical records indicate that Veasley reported that her cramping decreased from 8 out of 10 on a pain scale to 5-7 out of 10 after the bleeding episode at around 7:00 p.m. Upon arriving at the LDU, Veasley reported that her cramping had "resolved" and that she had no current bleeding. (Ex. 14 at 2). During the visit, Veasley was seen by Dr. Regina Chinsio-Kwong, a family practice resident. A pelvic examination revealed bright red blood oozing from the cervical os and pooling of blood in the posterior fornix. The cervical os appeared closed. A tocometer showed uterine contractions every 5 to 8 minutes. Dr. Sharkey

---

[4] Dr. Phillips testified that a placenta previa occurs when the placenta covers the cervix.

[5] Dr. Phillips testified that a placental abruption occurs when the placenta gets disconnected from its attachment to the uterine wall causing bleeding.

performed a transvaginal ultrasound on Veasley and the medical record notes that her "placenta appeared clear of the os vs low lying." *Id*. Veasley was monitored for several hours. She was discharged, she was sent home with instructions that included rest, pelvic rest, and a recommended ultrasound at 24-25 weeks gestational age. Dr. Chinsio-Kwong wrote a note in the medical record that was signed off by C.N.M. Moran.

Ten days later, on January 22, 2009, an obstetric ultrasound performed in Camp Pendleton's Radiology Department showed Veasley's placenta was clear of the cervical os and that her cervix was closed.

On January 23, 2009, Veasley had an appointment with Dr. Beazley at the NHCP family practice clinic for follow up from her visits to the LDU. Veasley reported vaginal bleeding sufficient to cause a streak of blood on one pad a day with associated cramping. The medical records show that Veasley's examination revealed a long and closed cervical os. After determining that there was no evidence of placenta previa, placenta abruption, infection, or preterm labor, and consulting with Dr. Ehle, an obstetrician, Dr. Beazley instructed Veasley to remain on bed rest with pelvic rest for the remainder of the pregnancy. Veasley was told to return to the clinic for medical evaluation if her bleeding or cramping increased. Dr. Beazley's plan for Veasley included a consultation with an obstetrician once Veasley reached the third trimester for evaluation of repeat Cesarean section; however, Dr. Beazley would continue managing Veasley's pregnancy until then.

On January 25, 2009 at approximately 11:00 p.m., Veasley returned to LDU complaining of cramping, contractions, vaginal bleeding for two days, and passing two blood clots. During the visit she was seen by Dr. Mark Lund, a family practice resident. A pelvic examination revealed a small drip of blood from the cervical os and bright red blood from the vagina. The exam showed that the cervix was long and closed. The tocometer demonstrated irregular uterine contractions. The medical note from the visit stated, "The spotting is normal the clot was not." *Id*. at 2. During the same visit, at

approximately 1:13 a.m. on January 26, 2009, Dr. Lund noted that the estimated gestational age was 23 weeks and 2 days, based on her LMP, and consistent with the date from the first trimester ultrasound.  The note indicated that there was "continued uterine irritability." *Id*. at 3.  The note stated, "Previable if [greater than] 24 [weeks] would consider then Steroids, [antibiotics]?  And transfer but at 23 weeks watchful waiting." *Id*.  The note stated that Veasley was instructed to remain on bed rest, to hydrate, to follow up in two days as scheduled, and to return if she experienced worsening contractions, more bleeding, or a gush of fluid.  At the end of this visit, Veasley was discharged.

On January 28, 2009, at approximately 9:00 a.m., Veasley returned to the LDU stating that she had been experiencing more painful contractions over the last three days and that her vaginal bleeding had increased so that she was leaving streaks on two pads per day.  At trial, Veasley testified that on January 28, 2009, when she went to the LDU, she was having severe contractions and pain.  During the visit, she was seen by Dr. Todd Quackenbush, a family practice resident.  At approximately 10:30 a.m., the tocometer revealed contractions approximately every three to five minutes.  The estimated gestational age of the pregnancy was 23 weeks and 4 days.  Dr. Lifset, the attending physician, examined  Veasley and found bleeding from her cervical os and that her cervix appeared long and closed.  The note states that on a pain scale, Veasley's pain was ten out of ten, "[t]otally [d]isabling." (Ex. 17 at 1).  At approximately, 12:30 p.m., Dr. Lifset noted that the tocometer showed contractions every five minutes.  Dr. Lifset's note states, in part,

> Follow up: 1 week(s) in the OB clinic or sooner if there are problems . . . . Pt does have IUD left in situ - perhaps this is leading to bleeding and contractions.  With no [evidence of] abruptio placentae and no [evidence of preterm labor] (no cervical dilation [over] multiple visits) - at this time will send patient home.  Continue bedrest.  Return for increase or change in bleeding or contraction pattern.

*Id*. at 3.  At the conclusion of the visit, at approximately 12:50 p.m., Veasley was discharged.

**D. Events After Veasley's Last Visit to the LDU**

At trial, Veasley testified that from the time she went home from the LDU, on January 28, 2009 at approximately 12:50 p.m., until the morning Brianna was born, on January 30, 2009 at approximately 8:15 a.m., her pain was less severe and that she was managing the pain with Tylenol.  Veasley testified that on January 29, 2009, she was using approximately three pads for the vaginal bleeding and that those pads were full of blood, not just streaks of blood.

Levera Veasley, Rodney Veasley's mother testified by deposition that after midnight on January 30, 2009, she went into Rodney and Mildred Veasley's bedroom because a light was on.  Levera Veasley testified that Mildred Veasley told her "that she was in a lot of pain and the pains were getting worse and she would scream out every now and then because she was in a lot of pain."  (Ex. 214 at 37:26-38:2).  Levera Veasley testified that Rodney Veasley called the hospital, but that she did not overhear the conversation.

Veasley testified that when she awoke on January 30, 2009, she was in "severe pain" and that she "couldn't really move or do much."  (ECF No. 102 at 15:1-4).  Veasley testified that she had not had pain that severe up until that point and so she called LDU that morning and "asked was there anything stronger that I could take or anything they could do for me."  *Id*. at 15:14-18.  Veasley testified that the LDU told her that there was "nothing that they could really do or give me, to continue to take the Tylenol, but if I felt like I need to come in . . . to come in."  *Id*. at 15:18-21.

Veasley testified that after she got off the phone, she was in "severe pain" that became "unbearable" and that she "felt the need to push."  *Id*. at 16:11-15.  At approximately 8:15 a.m., Brianna Veasley was born.  Ronald Veasley called 911.  The 911 operator told Ronald Veasley how to attend to Brianna until the ambulance arrived.  At approximately 8:24 a.m., an air ambulance arrived near the Veasley home and transported Brianna to Rady Children's Hospital San Diego ("Rady").  Veasley was transported to NHCP where two large clots and the IUD were expelled.  Pathologic

examination determined the IUD was an intact Mirena IUD.  Pathologic examination also determined that Veasley's placenta had maternal stage two and fetal stage one acute chorioamnionitis.[6]

### E. Brianna's Condition[7]

At the time of her birth, Brianna's estimated gestational age was 23 weeks and 6 days, measured by an LMP of August 15, 2008.  Brianna weighed one pound, eight ounces.  The World Health Organization ("WHO") defines extreme prematurity as birth before 28 weeks gestational age.  The WHO defines extremely low birth weight as less than 1000 grams, approximately 2.2 pounds.  Brianna met both of these definitions.

As a result of her extreme prematurity and low birth weight, Brianna was hospitalized at Rady from January 30, 2009 through March 9, 2009.  She was then transferred to Naval Medical Center San Diego where she was hospitalized until June 3, 2009.  On June 9, 2009, Brianna was readmitted to Naval Medical Center and then transferred to Rady on June 10, 2009, where she stayed until August 20, 2009.

Brianna's extreme prematurity and extreme low birth weight were substantial factors in causing her to suffer from medical problems early in life including a cerebellar hemorrhage, respiratory distress syndrome, pneumonia(s), a patent ductus arteriosus, sepsis, endocarditis, jaundice, apnea of prematurity, anemia of prematurity, retinopathy of prematurity, and gastroesophageal reflux disease.  Brianna required the placement of a gastrostomy tube in August 2009 which remained in place until April 2011, and ophthalmologic surgery.  Brianna's "extreme prematurity was a substantial factor in causing her severe to profound mental retardation" that more likely than not will continue into the future.  (ECF No. 48 at 7).  "As a result of her severe to profound mental retardation, Brianna Veasley will more likely than not never be able to be competitively employed" and will be unable to live independently.  *Id.* at 8.  The

---

[6] Chorioamnionitis is an inflamed placenta inside the uterus.

[7] The parties stipulated to the following facts about Brianna's condition in the pre-trial order.

amount of Brianna Veasley's claim for past medical expenses, exclusive of her claim for the care provided by her family, is the amount of her Medi-Cal lien.

## II. Medical Negligence Law

The Federal Tort Claims Act ("FTCA") provides that the United States may be held liable for "personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). In a case brought under the FTCA, liability is determined in accordance with the substantive law of the state where the alleged negligence occurred. *See* 28 U.S.C. § 1346(b); *Carlson v. Green*, 446 U.S. 14, 23 (1980).

To establish a claim for medical negligence in California, plaintiffs must prove all of the following elements by a preponderance of the evidence: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." *Hanson v. Grode*, 90 Cal. Rptr. 2d 396, 400 (Ct. App. 1999); *see also* Judicial Council of California Civil Jury Instruction ("CACI") 400; CACI 500. The parties do not dispute that Defendant owed Plaintiffs a duty of care. *See* Pretrial Order (ECF No. 48).

The standard of care in a medical malpractice case requires "that physicians and surgeons exercise in diagnosis and treatment that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances." *Mann v. Cracchiolo*, 694 P.2d 1134, 1143 (Cal. 1985); *see also* CACI 502. "Because the standard of care in a medical malpractice case is a matter peculiarly within the knowledge of experts, expert testimony is required to prove or disprove that the defendant performed in accordance with the standard of care unless

the negligence is obvious to a layperson." *Johnson v. Superior Court*, 49 Cal. Rptr. 3d 52, 58 (Ct. App. 2006) (internal citations omitted); *see also* CACI 501.

"The existing standard does not fault a medical professional for choosing among different methods that have been approved by the profession even if the choice later turns out to have been the wrong selection or not favored by other members of the profession." *N.N.V. v. Am. Assn. of Blood Banks*, 89 Cal. Rptr. 2d 885, 903 (Ct. App. 1999); *see also* CACI 505. "Mere error of judgment, in the absence of a want of reasonable care and skill in the application of his medical learning to the case presented, will not render a doctor responsible for untoward consequences in the treatment of his patient, or 'required to guarantee results.'" *Huffman v. Lindquist*, 234 P.2d 34, 40 (Cal. 1951) (internal citations omitted).

In a personal injury action,

> causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case . . . . There can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or disease. A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action.

*Bromme v. Pavitt*, 7 Cal. Rptr. 2d 608, 614 (Ct. App. 1992).

**III. Standard of Care**

**A. The IUD insertion**

**i. Expert Testimony**

At trial, the parties' experts agreed that the standard of care required that a healthcare provider reasonably rule out pregnancy before inserting an IUD. (Tr. Dr. Phillips ECF No. 107 at 22:5-8; Tr. Dr. Kingston ECF No. 93 at 13:22-14:4).

Plaintiff's obstetrical expert, Dr. Albert Phillips, testified that Dr. Almy "breached the standard of care by placing the IUD in a portion of the patient's cycle when she could not have been reasonably certain that there was not a pregnancy." (ECF No. 107 at 29:24-30:2).

Q.   [Plaintiffs' counsel]: As of 2008, did the standard of practice require a physician to take all steps necessary to reasonably rule out pregnancy before inserting an IUD?

A.   [Dr. Phillips]: Yes, absolutely.  The foremost thing when you're placing an IUD is to be relatively certain a patient is not pregnant. And for that reason, the physician has to be keenly aware of the woman's current status so that they don't put an IUD in a patient who is pregnant or could potentially be pregnant.

Q.   The information that we discussed a moment ago about [Veasley's] April 2008 childbirth, what, if anything, was significant about that fact with regard to the timing of insertion of the IUD that Mrs. Veasley wanted to have placed?

A.   Well, the important part of this history is that the patient is not – it is not clear exactly how regularly the patient's ovulation is.  So for that reason, this patient should never have an IUD inserted until she is on her menstrual cycle or immediately following her menstrual cycle, within seven days of the flow.  Because you don't know exactly during the cycle when she would be ovulating because of the close proximity of her last delivery.[8]  But you would never want to place an IUD in a woman who is in the second half of her month, when she potentially had ovulated, and not until the period occurs so that you're certain that she didn't get pregnant during that cycle.

*Id*. at 22:5-23:3.

Dr. Phillips explained that "ovulation occurs in a woman, who's 28 days, on the 14th day of her cycle."  *Id*. at 24:5-9.  Dr. Phillips explained that the only day a woman can get pregnant is the day that she ovulates.  Dr. Phillips stated that ovulation "begins the luteal phase," which is the time from the middle of a woman's menstrual cycle to the time of menstruation.  *Id*. at 24:2-4.  Dr. Phillips stated that the during the luteal phase the body produces progesterone,  "which is a by product of the ovulation." *Id*. at 24:5-9.  Dr. Phillips stated that within three to four days after implantation, which occurs "approximately seven days after conception," the hormone beta hCG[9] "gets to

––––––––––––––––––––

[8] Dr. Phillips testified that after a woman delivers a baby, it may take some time before her menstrual cycle becomes regular as her body adjusts to a nonpregnant state.

[9] A urine pregnancy test tests for a hormone called human chorionic gonadotropin known as "hCG."

1    a level that would be able to be found on a urine pregnancy test." *Id*. at 24:15-18.

2        Dr. Phillips testified that "classically" women have a 28-day menstrual cycle, but

3    that women can fall "two standard deviations on either side of that 28 would go from

4    a range of 21 days to 40 days. . . so women [] don't always ovulate on the 14th day."

5    *Id*. 24:23-25:2.  Dr. Phillips testified that "sperm can live up to seven days." *Id*. at 25:5.

6    Dr. Phillips testified that even though "there is only one day when [a woman] can get

7    pregnant, the day she ovulates," because of the extended life of sperm, a woman may

8    get pregnant even though she had not had intercourse for several days before her date

9    of ovulation. *Id*. at 25:16-26:8.

10        Dr. Phillips further testified that the standard of care for a patient that is not on

11    birth control is to insert an IUD "during the [menstruation] cycle or immediately within

12    seven days of the cycle." *Id*. at 30:9-24.  Dr. Phillips testified that his opinion was

13    corroborated by the package insert of the Mirena IUD, which stated that an IUD should

14    be inserted within seven days of the onset of menstruation.

15        Dr. Phillips testified that if Veasley had a "consistent ovulation" and was on a 27-

16    or 28-day menstrual cycle, on the date of the IUD insertion with Dr. Almy, Veasley's

17    menstrual period would have been a day or two late. *Id*. at 27.  Dr. Phillips noted that

18    it was unclear when Veasley would be ovulating "because of the close proximity of her

19    last delivery." *Id*. at 22: 22-23.  Dr. Phillips explained that "women don't always

20    ovulate exactly the same day of their cycle, especially right after having a child." *Id*.

21    at 27:20-21.

22        Dr. Phillips testified that a negative urine pregnancy test did not reasonably rule

23    out pregnancy in this case because there is "approximately 10 to 11 days" after

24    conception that a woman will still get a negative urine pregnancy test. *Id*. at 29:7-8;

25    28:8-10.  Dr. Phillips stated, "for [Dr. Almy] to rely on a negative pregnancy test, and

26    the patient is still in the luteal phase and has not yet had her menstrual cycle is where

27    I have concerns in [Dr. Almy's] management." *Id*. at 28: 11-13.  Dr. Phillips testified

28    that a patient such as Veasley, who is not on any birth control, the "[s]tandard of care

required that the [IUD] insertion be occurring during the cycle or immediately within seven days of the cycle" because at that point a physician "can be reasonably certain that they're not pregnant." *Id*. at 30:20-31:7.

Defendant's obstetrical expert, Dr. Jessica Kingston, testified that Dr. Almy reasonably excluded pregnancy before inserting the IUD. Dr. Kingston stated,

> She took menstrual history. She documented regular menstrual cycle. She was aware of what she had previously said to the patient at the previsit that occurred at the end of July, that she instructed her to abstain or use condoms until the IUD can be inserted.

> She documented the first day of Mrs. Veasley's last menstrual period at the time of the insertion visit. That was August 12th, and she performed a urine pregnancy test, and that urine pregnancy test was negative.

(ECF No. 93 at 24:6-14).

Dr. Kingston testified that the standard of care allows an IUD to be placed at any time of a woman's menstrual cycle as long as pregnancy can be reasonably excluded. Dr. Kingston explained that "roughly 12 to 24 hours" before ovulation occurs, a woman's luteinizing hormone ("LH") reaches its maximum blood level, known as the "LH peak." *Id*. at 27:12-15. Dr. Kingston testified that the LH peak is the best indicator for when hCG levels will be high enough in a woman to trigger a positive urine pregnancy test because the LH peak can be measured clinically with a blood test, as opposed to the date of ovulation which cannot be measured precisely. Dr. Kingston stated that "implantation is known to occur seven days after [ovulation,] or six to seven days after the LH peak." *Id*. at 28:21-22.

Dr. Kingston explained that a urine pregnancy test with a sensitivity of 25 international units per liter ("IU/l")[10] "may become positive . . . 10 to 12 days after the LH peak . . . ." *Id*. at 29: 18-22. Dr. Kingston testified that

> [a] urine pregnancy test is more reliable the further along a woman is in her luteal phase. If she is in her early luteal phase or prior to implantation, you wouldn't rely on that urine pregnancy test. You might look at other

_____

[10] The parties' experts agree that the urine pregnancy test at issue in this case had a sensitivity of 25 international units per liter.

> factors.  If a woman is in her late luteal phase or the last few days of her luteal phase, that urine pregnancy test is much more reliable.

*Id.* at 65:18-24.  Dr. Kingston testified that "with the urine pregnancy test that has a sensitivity of 25, the urine may reveal a positive result as early as three to four days after implantation . . . [and] by seven days [after implantation], 98 percent will be positive."  *Id.* at 66:13-19.  Dr. Kingston testified that seven days after implantation a doctor acting within the standard of care could be confident in the accuracy of the pregnancy test.

> A.   [Dr. Kingston]: Ms. Veasley on September 9th was on day 29.  Dr. Almy could reasonably conclude that she has an average cycle length, and she would . . . be more than 12 days from an expected LH peak, and that the urine pregnancy test, a negative result means to Dr. Almy that she is not pregnant.

> Q.   [Defendant's counsel]: [I]f Dr. Almy assumed that this might be a up to a 30-day cycle, when would she have —the standard of care required her to determine ovulation would likely occur?

> A.   [I]f the cycle length is 30 days, the second half of the cycle or known as the luteal phase is a constant.  It is 14 days, so that would add two days, and you would say that ovulation would occur on approximately day 16.

> Q.   When would the LH peak occur?

> A.   Around day 15.

> Q.   And 12 to 13 days after day 15 would be what day of the cycle?

> A.   Would be day . . . 27 to 28 . . . .

*Id.* at 29:23-30:3.  Dr. Kingston testified that based on the timing of the urine pregnancy test in this case, Dr. Almy could reasonably rely on the test to rule out pregnancy in Veasley.[11]

Dr. Kingston testified that a doctor would not use the pregnancy test results

---

[11] The parties do not dispute that on September 9, 2008, Dr. Almy inserted a Mirena IUD and that Veasley was pregnant at that time of the insertion.  (ECF No. 48 at 3 ¶ 12).

"alone to make a clinical decision about whether to place the IUD." *Id*. at 66:23-25. Dr. Kingston testified that in addition to the pregnancy test results, a doctor would use the date of the last menstrual period and "information as to whether Mrs. Veasley had been using birth control . . . ." *Id*. at 67:1-10.  Dr. Kingston testified that the standard of care required that Dr. Almy be aware that on September 9, Veasley might have been pregnant.  Dr. Kingston testified that "the standard of care required that Dr. Almy obtain [a sexual] history either previously or at that visit if that was the first time she saw her." *Id*. at 53:6-10.  Dr. Kingston stated,

> Q.   [Plaintiffs' counsel]: Doctor, what I am talking about is that if Dr. Almy is evaluating Mrs. Veasley for possible pregnancy on September 9th, she needs to consider Mrs. Veasley's sexual history between the last visit and September 9th; correct?
>
> A.   [Dr. Kingston]: Yes, but she also takes into account what had occurred on her prior visit and her prior knowledge of the patient's history. You would not take that information in isolation to come to a conclusion.
>
> Q.   One of the things that Dr. Almy was required by the standard of care to consider on September 9th, 2008, was Mrs. Veasley's sexual history between the last visit and September 9th; correct?
>
> A.   That would be part of the entire history, yes.

*Id*. at 56:7-19.  Dr. Kingston testified,

> Q.   [Plaintiffs' counsel]: If the patient gives a history of having unprotected sex at a time when she may have been close to ovulation, that would be important information to Dr. Almy in considering whether to go ahead with the IUD insertion that day; correct?
>
> A.   [Dr. Kingston]: Correct.

*Id*. at 61: 9-13.

### ii. Discussion

Plaintiffs contend that Dr. Almy acted below the standard of care because she failed to reasonably rule out pregnancy before inserting the Mirena IUD on September 9, 2008.  Plaintiffs contend that Dr. Almy's insertion of the IUD, twenty-nine days after

the start of Veasley's LMP, was contrary to Mirena manufacturer's recommendation, the NHCP Family Medicine Department Policy, and Dr. Almy's own custom and practice. Plaintiffs contend that it was too early in the pregnancy for Dr. Almy to rely on the negative urine pregnancy test to reasonably rule out pregnancy. Plaintiffs contend that "the standard of practice required Dr. Almy to obtain a sexual history from Veasley" prior to inserting the IUD. (ECF No. 108 at 21).

Defendant contends that Dr. Almy did not violate the standard of care because Dr. Almy took steps to reasonably rule out pregnancy similar to those steps taken by other reasonably careful healthcare providers. Defendant contends that "many reasonably careful healthcare providers do not limit themselves to placing IUDs in women like Mildred Veasley to the first seven days of their menstrual cycle." (ECF No. 111 at 27). Defendant contends that the standard of care allowed Dr. Almy to rely on the result of the urine pregnancy test to reasonably rule out pregnancy. Defendant contends that at the insertion appointment the standard of care did not require Dr. Almy to ask Veasley about her sexual activity between her appointment on July 31, 2008 and the appointment on September 9, 2008.

In this case, the parties' experts agree that the standard of care required that Dr. Almy reasonably rule out pregnancy before inserting an IUD. Dr. Almy testified that she reasonably ruled out pregnancy at the September 9, 2008 appointment by giving Veasley a urine pregnancy test. Dr. Almy testified that at the time of the appointment, Veasley "would have been 29 days, so I would have been reasonably ensured that a negative [pregnancy test] would have been a true negative." (ECF No. 92 at 48:16-19). Dr. Almy further testified that because she "counseled [Veasley] to use condoms or abstain from sex" at the initial visit on July 31, 2008, Dr. Almy reasonably concluded that Veasley "was following the counseling that [she] had set in motion." *Id.* at 50:2-10. Dr. Almy testified that it was her custom and practice to "schedule [a patient's] appointment to be at the expected time of the [menstrual] cycle starting" because "if she was bleeding, then I would be reasonably ensured that she was on her

cycle."  (ECF No. 92 at 56:10-11).

At trial, both parties' experts testified that during the early stages of a pregnancy, a woman will not have produced enough hCG hormone to result in a positive urine pregnancy test.  Dr. Phillips explained that the standard of care when inserting an IUD in a patient who is not on birth control, such as Veasley, requires that the IUD be inserted "during the [menstrual] cycle or immediately within seven day of the cycle" because "we know physiologically that . . . is the time of the cycle where the mother could not have gotten pregnant or is not pregnant currently."  (ECF No. 107 at 30:9-31:7).  Dr. Phillips testified that a doctor "would never want to place an IUD in a woman who is in the second half of her month, when she potentially had ovulated, and not until the period occurs so that you're certain that she didn't get pregnant during that cycle." *Id.* at 22:24-23:3.  Dr. Phillips testified that in this case, a negative result on the urine pregnancy test did not reasonably rule out pregnancy.  Dr. Phillips explained that "there is going to be approximately 10 to 11 days" when a woman "has had a conception and still will get a negative pregnancy test." *Id.* at 28:7-10.

Dr. Kingston testified that the standard of care allows an IUD to be placed at any time of a woman's menstrual cycle as long as pregnancy can be reasonably excluded. Dr. Kingston testified that implantation is known to occur seven days after ovulation and that seven days after implantation "98 percent" of urine pregnancy tests with a sensitivity of 25 IU/l "would be positive." (ECF No. 93 at 65: 1-4).  Dr. Kingston testified,

> Q.   [Plaintiffs' counsel]: Doctor, seven days after implantation is when a doctor act[ing] within the standard of care could consider a negative result to be reliable; correct?
> . . . .
>
> A.   [Dr. Kingston]: [A] physician wouldn't take that in isolation.  They would put it into context with a patient's menstrual history, with her contraceptive history, and where she happens to be in her cycle.
>
> A urine pregnancy test is more reliable the further along a woman is in her luteal phase.  If she is in her early luteal phase or prior to implantation, you wouldn't rely on the urine pregnancy test.  You

might look at other factors.

If a woman is in her late luteal phase or the last few days of her luteal phase, that urine pregnancy test is much more reliable.

*Id*. at 65: 5-24.  Dr. Kingston testified that, assuming Veasley was on a 28 day cycle, Dr. Almy could "reasonably conclude that . . . the urine pregnancy test result can be relied upon because if Ms. Veasley was, in fact, pregnant, that urine pregnancy test should have been positive at that particular time in her cycle on day 29." *Id*. at 29:24-30:3.  However, Dr. Kingston also testified that a patient's history of sexual intercourse close to the time of ovulation would have been important information for Dr. Almy to consider when deciding whether to insert the IUD.  Specifically, Dr. Kingston testified,

Q.    [Plaintiffs' counsel]: When you were referring to what that patient has done prior to that visit in terms of her sexual activity and contraception, you are referring to the insertion visit of September 9th; correct?

A.    [Dr. Kingston]: Correct, but when you see a patient on that visit, you also take into account the information that you would have obtained from her in her history taking [sic] prior to that visit.

Q.    Doctor, what I am talking about is that if Dr. Almy is evaluating Mrs. Veasley for possible pregnancy on September 9th, she needs to consider Mrs. Veasley's sexual history between the last visit and September 9th; correct?

A.    Yes, but she also takes into account what had occurred on the prior visit and her prior knowledge of the patient's history.  You would not take that information in isolation to come to a conclusion.

Q.    One of the things that Dr. Almy was required by the standard of care to consider on September 9th, 2008, was Mrs. Veasley's sexual history between the last visit and September 9th; correct?

A.    That would be part of the entire history, yes.

*Id*. at 55:25- 56:19.

In this case, Veasley was not menstruating at the time of the September 9, 2008 appointment.  Dr. Phillips testified that if Veasley had a "consistent ovulation" and was on a 27- or 28-day menstrual cycle, on September 9, Veasley's menstrual period would

have been a day or two late.  (ECF No. 107 at 27).  Veasley testified that she had sexual intercourse on August 23 or 24 and that she thought she might be pregnant at the appointment to insert the IUD.  Veasley testified that at her insertion appointment  no one asked her about her  sexual activity between her appointment on July 31, 2008 and the appointment on September 9, 2008.  Veasley was given a urine pregnancy test, and the test came back negative.  Dr. Almy then inserted the IUD.

The parties' experts agreed that a urine pregnancy test is not reliable at the early stages of pregnancy.  The parties' experts agreed that a urine pregnancy test with a sensitivity of 25 international units per liter could begin to detect a pregnancy approximately three to four days after implantation.  Dr. Kingston testified that seven days after implantation a urine pregnancy test would have a 98% accuracy rate and a doctor acting within the standard of care could rely on that test.  Dr. Kingston testified that "the doctor doesn't use that information alone to make a clinical decision about whether to place the IUD."  (ECF No. 93 at 66).  Dr. Kingston testified that Dr. Almy needed to take into account Veasley's "entire history," including Veasley's sexual history between the last visit and the September 9 visit.  Dr. Phillips testified that a doctor "would never want to place an IUD in a woman who is in the second half of her month, when she potentially had ovulated," and not started her menstrual cycle because she may be pregnant.  (ECF No. 107 at 22-23).  Dr. Phillips testified that a negative urine pregnancy test did not reasonably rule out pregnancy in Veasley because she may not have been producing "enough hCG levels so that it could be picked upon the urine test." *Id*. at 29.

The Court finds that the standard of care required Dr. Almy to reasonably rule out pregnancy.  The Court finds that based on the testimony of the parties' experts regarding Veasley's menstrual cycle and the accuracy of urine pregnancy tests at the early stages of pregnancy, Dr. Almy could not have reasonably relied on a negative urine pregnancy test to rule out pregnancy on September 9.  The Court concludes that under the facts of this case, Dr. Almy failed to reasonably rule out pregnancy by relying

upon the negative urine pregnancy test without considering Veasley's "entire history," including her sexual activity between her appointment on July 31, 2008 and the appointment on September 9, 2008. *See* ECF No. 93 at 56:19. The Court concludes that Plaintiffs have met their burden of showing by a preponderance of the evidence to prove that Dr. Almy breached the standard of care by inserting the IUD because Dr. Almy had not reasonably ruled out pregnancy.

**B. NHCP Personnel and the Hospital Visits in January 2009**

**i. Expert Testimony**

Plaintiffs' expert, Dr. Phillips, testified that the NHCP personnel violated the standard of care several times when Veasley went to the hospital in January 2009. Dr. Phillips testified that the NHCP personnel first breached the standard of care when they sent Veasley home on January 13, 2009 after she went to the LDU on January 12 with complaints of vaginal bleeding and cramping. Dr. Phillips testified that at that time the standard of care "required that [Veasley] be admitted to the hospital and to be given medications that would stop [her] contractions." (ECF No. 107 at 64:7-9).

Dr. Phillips testified that at Veasley's follow up appointment on January 23, 2009, the standard of care required that Dr. Beazley recognize that Veasley's bleeding was caused by the retained IUD. Referring to Veasley's health record from that visit, Exhibit 11, Dr. Phillips testified that Veasley's risk level should not have been listed as "uncomplicated" because a pregnancy with a retained IUD is "the most complicated" pregnancy a woman could have. *Id*. at 64:13-65:4. Dr. Phillips emphasized that prior to the visit on January 23, "no one had ever considered that [the retained IUD] is the explanation for why [Veasley] had been bleeding" even though that information was on the problem list in Veasley's medical records. *Id*. at 67:6-14. Dr. Phillips testified that the standard of care required Dr. Beazley to hospitalize Veasley on January 23rd so that she could be monitored. Dr. Phillips testified, "it appears that [Dr. Beazley] had no—not no knowledge, but no assessment that this was a higher risk situation by virtue of the fact that [Dr. Beazley] didn't believe these things needed more careful treatment."

*Id.* at 69:16-21.

When asked about Veasley's visit to the LDU on late evening January 25, Dr. Phillips testified,

> Q.   [Plaintiffs' counsel]: [T]he assessment and plan from Dr. Lund, he indicates that there is no change in cervix, no clinical evidence of abruption, continued uterine irritability.  Do you see that?
>
> A.   [Dr. Phillips]: I do.
>
> Q.   And then he states, "pre-viable if greater than 24 weeks, would then consider steroids, possibly antibiotics, and transfer, but at 23 weeks, watchful waiting."  And then, "bed rest, hydration, follow up in two days as scheduled.  Preterm predations given.  Return if worsening contractions, more bleeding, or gush of fluid."  Do you see that?
>
> A.   I do.
>
> Q.   Did that plan comply with the standard of care on January 26th, 2009, the plan that Dr. Lund has documented?
>
> A.   Absolutely not.  Again, this is an ongoing condition.  The patient required at this point certainly to be admitted, to stop those contractions, to watch her carefully, and to know that even at 23 weeks, that there are —in our literature, obstetrical and other literature, that 23-week fetuses are and can be viable, as in this case. And that potentially watchful waiting would not be the appropriate management.

*Id.* at 73:5-25.  Dr. Phillips testified that the standard of care required that the LDU administer tocolytics[12] to Veasley.  Dr. Phillips testified, that tocolytics would not be contraindicated for a patient that was not in active labor and who did not have cervical changes.  Dr. Phillips explained,

> A.   [Dr. Phillips]: [I]n this situation, with this set of circumstances, with this patient, with a retained IUD.  You're required to address those contractions and the bleeding . . . .
>
> Q.   [Plaintiffs' counsel]: What is it about Mrs. Veasley's specific situation with the retained IUD that mandated the tocolytics?  What benefit with Mrs. Veasley not being in labor would the tocolytics

---

[12] Dr. Kingston defined tocolytic medication as "any medication used to try to stop or decrease uterine contractions."  (ECF No. 93 at 40:3-5).

have had as of January 2006?

A.   It is because of the mechanism by which the IUD is causing the contractions.  The IUD presumably, and more likely than not by medical certainty, was the cause of the contractions . . . The IUD itself is the cause for the problem of the contractions . . . . It is well known that an IUD retained pregnancy is at very high risk from prematurity and preterm labor.  It is the cause. . . . This is a very specific and unique situation.  And the standard of care did require that they stop those contractions so that to minimize the . . . IUD's action on the uterus itself in causing the contractions.

*Id*. at 75:7-76:8.  Dr. Phillips testified that the need to give steroids would depend on how the patient responded to tocolytics.  Dr. Phillips testified that "[i]f there was evidence that the tocolysis or attempts to stop the uterine contractions were failing, and that there was going to be a high likelihood that the baby would deliver, then it would have been appropriate to use the steroids at that time to accelerate the lung maturity." *Id*. at 77:22-78:2.

Referring to Veasley's January 28, 2009 visit, Dr. Phillips testified that Veasley's discharge plan did not comply with the standard of care.  Dr. Phillips testified that,

Dr. Lifset actually recognizes that [Veasley] has the IUD in place, has a patient who has been having ongoing contractions, ten-out-of-ten pain, having bleeding, and yet he doesn't consider that the IUD is the source of this . . . . A reasonably, careful obstetrician would clearly understand that at this point, this patient is having all of her problems due to the IUD in place.  And the standard required at that point is certainly to aggressively approach this patient by admitting her, placing her on tocolysis, and aggressively managing her so that we can salvage this pregnancy as best as possible.

*Id*. at 81:11-22.

On cross-examination, Dr. Phillips noted that in the American Congress of Obstetricians and Gynecologists ("ACOG") Practice Bulletin 127, Exhibit 108, states "there may be times when it is appropriate to administer tocolytics before viability . . . ." (ECF No. 100 at 20:12-14).  However, Dr. Phillips admitted that he was not aware of any "medical textbook, journal, article, medical guideline, or other source" that recommends that a woman with an IUD who is experiencing preterm contractions

should be admitted and treated with tocolytics.  *Id.* at 14:10-14.  Dr. Phillips explained that the condition of a pregnant woman with a retained IUD is so rare that it would "not warrant enough patients to make an article . . . ."  *Id.* at 114:14-15.  He also testified that it would not be appropriate to conduct a controlled study because "to randomize a woman like that into a group that wouldn't receive those treatments" because of the high risk for premature delivery.  *Id.* at 114:4-115:2.  Dr. Phillips stated that he had "no personal experience giving tocolytics to a pregnant woman with an IUD in their uterus who is experiencing preterm contractions."  *Id.* at 129:16-19.  Dr. Phillips stated that 80% of women experiencing preterm contractions stop having contractions without any intervention.  Dr. Phillips stated that on Veasley's last visit to NHCP on January 28, 2009, Veasley was not in pre-term labor because her cervix was not dilated.

Dr. Kingston, Defendant's expert, testified that the standard of care required that physicians caring for Veasley in January 2009 be aware that Veasley was pregnant and had a retained IUD.  Dr. Kingston testified,

> if a woman conceives with an IUD in place or if it is placed when an early pregnancy exists, there is a much greater risk for a loss in the first trimester of pregnancy.  And in studies that have tried to quantify that risk, they've ranged from 40 to 50 percent first trimester loss rate . . . . [W]omen who do not have an IUD in place, the rate of miscarriage is 10 to 15 percent . . . . If you make it beyond the first trimester and into the second trimester, the loss rate or early preterm birth rate for women who ha[ve] a retained IUD is roughly 18 percent.

(ECF No. 93 at 32:25-33:16).  Dr. Kingston testified that the evaluation of a pregnant patient with a retained IUD "doesn't change . . . in any way, only knowing that it is a risk factor, but the same physical examination, the same lab tests would be done in a patient who presents with those complaints who is suspected to have a retained IUD or who presents with those complaints who doesn't have that suspicion at all."  *Id.* at 33:25-34:5.  Dr. Kingston testified that when Veasley went to NHCP with complaints of vaginal bleeding, cramping, and pain,

> [Veasley] was evaluated systematically and comprehensively including history, a physical exam, and lab tests that were appropriate based on the complaints that she presented with.  And at the conclusion of each visit,

she was not found to have any acute issue[s] that would require hospitalization.

*Id.* at 31:7-12.

Dr. Kingston testified that the standard of care did not require Veasley to be admitted to the hospital during any of her visits to NHCP because "she did not meet criteria for the diagnosis of preterm labor." *Id.* at 35:22-23.  Dr. Kingston testified that at all of the appointments, Veasley's "cervical length was normal.  Her cervix was not dilated, and as such she did not have the diagnosis of preterm labor." *Id.* at 35: 23-25. Dr. Kingston explained that Veasley "was having preterm contractions, but preterm contractions do not always translate into preterm labor." *Id.* at 36: 18-20.  Dr. Kingston explained that "[m]any if not most women in the third trimester and even the second trimester of pregnancy have contractions, and that does not confer risk for preterm labor and preterm birth in and of itself." *Id.* at 36: 20-23.  Dr. Kingston testified that Veasley did not meet the criteria to be admitted for any other diagnoses, such as placenta previa or a placental abruption.

Dr. Kingston testified that the standard of care did not require treatment with tocolytics.  Dr. Kingston testified that tocolytics "are not generally recommended for women before the time of viability, which in general is considered to be 24 weeks gestation." *Id.* at 40:12-14.  Dr. Kingston testified that tocolytics may be given before 24 weeks "[i]f preterm birth is felt to be imminent and there is no contraindication to tocolytics." *Id.* at 40: 15-18.  Dr. Kingston testified that tocolytics may be given to a pregnant woman who is having intraabdominal surgery, but that even in that case, if the woman was less than twenty-four weeks pregnant the standard of care does not require the administration of tocolytics because there is no evidence that tocolytics are effective.  Referring to ACOG Practice Bulletin 127, Exhibit 108, Dr. Kingston testified that "[i]n general, tocolytics are not indicated for use before neonatal viability. Regardless of interventions, perinatal morbidity and morality at that time are too high to justify the maternal risks associated with tocolytic therapy." *Id.* at 42:24-43:2.  Dr. Kingston testified that having an IUD might be a contraindication to tocolytics:

Q.    [Defendant's counsel]: What about in the context of, let's say, a woman who is pregnant with a known IUD in place, would that change the analysis of when to treat such a woman with tocolytics?

A.    [Dr. Kingston]: No.

Q.    Why not?

A.    It would actually make me want to use tocolytics a lot less. There is no evidence that the tocolysis will work, and in that situation I would be concerned that it is a contraindication.

Q.    Why might it be a contraindication?

A.    So in women who have a retained IUDs, one of the reasons that preterm labor and preterm birth ensues is because of intrauterine infection, and if you suspect or highly suspect that your patient has an intrauterine infection, tocolysis is actually contraindicated because you don't want to prolong the pregnancy and keep the baby in that dangerous environment.

Q.    And besides being a danger to the baby, would giving tocolytics in the setting of a uterine infection cause a potential risk to the mother as well?

A.    Yes. So a mother is at risk when she has uterine infection. If it is sustained of that progressing further to sepsis and even death, if it becomes severe enough, and sepsis affect her future fertility and put her at risk of needing aggressive interventions to treat that septic infection.

*Id*. at 43:3-44:2.  Dr. Kingston testified that she was not aware of any "reliable medical resources" that recommend that tocolytics be used in a preterm woman with a known IUD in place who was experiencing preterm contractions but showed no cervical changes.  *Id*. at 44:3-6.

Dr. Kingston testified that the standard of care did not require the doctors to administer "corticosteroid medications" to Veasley because she was not in preterm labor and was at less than twenty-four weeks gestation.  *Id.* at 51: 4-12.  Dr. Kingston explained that "corticosteroids are given when a patient appears to be at imminent risk for preterm births, they are known to . . . accelerate lung maturity, and they have been shown to reduce risk for brain hemorrhage, as well as complications with a condition

called necrotizing enterocolitis, which is a risk for babies born prematurely." *Id*. at 49: 21-50:1. Dr. Kingston testified that corticosteroids are recommended if a woman is "between 24- and 34-weeks gestation and she is deemed to be at imminent risk of preterm birth and there are no contraindications to using corticosteroids." *Id*. at 50:4-6. Dr. Kingston stated that there "is no consistent scientific evidence that corticosteroids are beneficial in gestations less than 24 weeks." *Id*. at 51:1-3.

### ii. Discussion

Plaintiffs contends that Defendant acted below the standard of care by failing to admit Veasley to the hospital and administer tocolytics and antenatal steroids when she presented to the hospital on multiple occasions from January 13, 2009 to January 28, 2009. Defendant contends that the standard of care did not require admission to the hospital or the administration of tocolytics or antenatal steroids, medications that would stop her contractions, because Veasley was not in preterm labor when she presented at the hospital and she was at less than twenty-four weeks gestation.

In this case, Dr. Phillips testified that the NHCP personnel should have admitted Veasley and administered tocolytics. Dr. Phillips testified that there may be times when it is appropriate to administer tocolytics before twenty-four weeks gestation; however, Dr. Phillips opinion was not supported by any medical literature regarding the treatment of women in Veasley's condition with tocolytics. Dr. Phillips testified that he had no personal experience administering tocolytics to a woman in Veasley's condition. Dr. Kingston testified that the standard of care did not require the administration of tocolytics or steroids to pregnant women less than twenty-four weeks estimated gestational age and to women who are not in preterm labor. Dr. Kingston testified that Veasley did not meet the criteria to be admitted at any time during January 2009. The Court finds that even if, as Dr. Phillips testified, tocolytics may have been administered, there is no evidence in the record that the NHCP personnel were required by the standard of care to admit Veasley and administer tocolytics. *See N.N.V. v. Am. Assn. of Blood Banks*, 89 Cal. Rptr. 2d at 903 ("The existing standard does not fault a medical

1   professional for choosing among different methods that have been approved by the
2   profession even if the choice later turns out to have been the wrong selection or not
3   favored by other members of the profession."). The Court concludes that the NHCP
4   personnel did not violate the standard of care by not admitting Veasley and
5   administering tocolytics and steroid medications because Veasley's pregnancy was less
6   than twenty-four weeks gestation and she was not in preterm labor.

7   **IV. Causation**

8       Plaintiffs contend that "there is no evidence, and no reason to suppose that
9   Mildred Veasley would have had anything other than a normal pregnancy, and no
10  evidence, and no reason to suppose that Brianna Veasley would have been anything but
11  neurologically normal" had Dr. Almy not inserted the IUD after Veasley became
12  pregnant. (ECF No. 112 at 26). Defendant concedes that it is "not arguing causation
13  with regard to the insertion of the IUD." (ECF No. 111 at 44 n. 23). The parties
14  stipulated that Brianna's premature birth was a substantial factor in causing her "severe
15  to profound mental retardation," and that her extreme prematurity and low birth weight
16  were substantial factors in causing her to suffer from medical problems. (ECF No. 48
17  at 7-8). The Court concludes the Dr. Almy's failure to reasonably rule out pregnancy
18  before inserting the IUD was a substantial cause of Brianna's premature birth.
19  Accordingly, the Court finds that Dr. Almy's failure to reasonably rule out pregnancy
20  before inserting the IUD was a substantial factor in causing harm to Veasley and
21  Brianna and that Plaintiffs are entitled to damages.

22  **V. Damages**

23      Section 1431.2(b)(1) of the California Civil Code states:

24      [T]he term "economic damages" means objectively verifiable monetary
        losses including medical expenses, loss of earnings, burial costs, loss of
25      use of property, costs of repair or replacement, costs of obtaining
        substitute domestic services, loss of employment and loss of business or
26      employment opportunities.

27  Cal. Civ. Code § 1431.2(b)(1). "In tort actions, medical expenses fall generally into the
28  category of economic damages, representing actual pecuniary loss caused by the

defendant's wrong." *Hanif v. Hous. Auth.*, 246 Cal. Rptr. 192, 195 (Ct. App. 1988). "The burden of proof is upon the party claiming damages to prove that he has suffered damage and to prove the elements thereof with reasonable certainty." *Peters v. Lines,* 275 F.2d 919, 930 (9th Cir. 1960). "[D]amages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery." *Frustuck v. City of Fairfax*, 28 Cal. Rptr. 357, 371 (Ct. App. 1963).

## A. Past Expenses

### i. Past Medical Expenses

The parties agree that the amount of Brianna's claim for past medical expenses, exclusive of her claim for the care provided by her family, is her Medi-Cal lien in the amount of $1,875.41. The Court concludes that Plaintiffs are entitled to recover $1,875.41 for past medical expenses.

### ii. Reasonable Value of Extraordinary Parental Care

Plaintiffs contend that they are entitled to $180,961.70 in damages for extraordinary parental care provided to Brianna based on the testimony of Mildred and Rodney Veasley. Defendant contends that the Court should not award that amount because Plaintiffs do not explain how they reached the total dollar amount.

In their pre-trial order, the parties agreed to the following:

> If the Court finds in favor of plaintiff Brianna Veasley on the issues of negligence and causation, she is entitled to recover the reasonable value of gratuitously furnished home nursing and attendance provided by her family necessitated by the Defendant's tortious conduct, notwithstanding the absence of any out-of-pocket expenditures. The measure of recovery is the amount for which reasonably competent nursing and attendance by others could have been obtained.

(ECF No. 112 at 32); *see also Hanif*, 246 Cal. Rptr. at 198 ("It is established that 'the reasonable value of nursing services required by the defendant's tortious conduct may be recovered from the defendant even though the services were rendered by members of the injured person's family and without an agreement or expectation of payment. Where services in the way of attendance and nursing are rendered by a member of the

plaintiff's family, the amount for which the defendant is liable is the amount for which reasonably competent nursing and attendance by others could have been obtained.'").

At trial, Rodney Veasley testified that he spends approximately an hour a day caring for Brianna. Mildred Veasley testified that after Brianna's birth, Rodney was deployed for a year. Mildred Veasley testified that she spends, on average, "three or four hours more a day" to care for Brianna than she spent caring for her sons at the same age. (ECF No. 102 at 35: 1-2). Veasley testified that she performs the following tasks for Brianna that she did not have to perform for her sons:

> I feed her. I still have to change her clothes. I still change her diaper, and the ongoing potty training. Constantly having to watch her throughout the day because of her lack of knowing of her surroundings of danger, and hurting herself, her self-stimulation issues, her sleeping habits, not sleeping through the night. We check on her at least three times throughout the night. We're constantly checking on her.

*Id*. at 35: 5-12. Veasley testified that it takes about 15-20 minutes to feed Brianna. Veasley testified that she changes Brianna's diaper 3-4 times a day during the weekend, and twice a day during the week. The evidence shows that Brianna was in the hospital for approximately eight months after her birth. The Court concludes that Plaintiffs are entitled to recover the reasonable value of services provided to Brianna above and beyond what would be required to take care of a non-injured child. The Court uses $18.86 as the hourly rate based on the hourly attendant care rate set forth in the life care plan developed by Plaintiffs' life care planner, Carol Hyland. The Court awards damages in the amount of $180,961.70.[13]

**B. Net Discount Rate**

---

[13] Brianna Veasley was born January 2009. At trial Brianna was approximately 6 years and 9 months old. Brianna spent 8 months in the hospital. The Court calculates the reasonable value of extraordinary parental care as follows:

Rodney: $18.86 x 1 (hour) x 365 (days) x 5 (years) = $34,419.50

Mildred: $18.86 x 3.5 (hours) x 365 (days) x 6 (years) and 1 month (30 days) = $146,542.20

Total = $180,961.70

Damages awards based on future wages or future expenses "are usually discounted to present value to account for the fact that a plaintiff, by receiving the money in a lump sum, 'up front,' will invest the sum and earn additional income from the investment." *Trevino v. United States*, 804 F.2d 1512, 1517 (9th Cir.1986), *cert. denied*, 484 U.S. 816 (1987).  However, the effects of inflation must be taken into account so as not to under-compensate the plaintiff. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 537 (1983).  "The present value of a lump sum award may be determined . . . by calculating the difference between the market rate of interest and the anticipated rate of inflation and then discounting by this real interest rate . . . ." *Colleen v. United States*, 843 F.2d 329, 331 (9th Cir. 1987) (citing *Trevino*, 804 F.2d at 1519). "The discount rate should be based on the rate of interest that would be earned on the best and safest investments." *Pfeifer*, 462 U.S. at 537 (internal citations omitted).  A district court "should" not be reversed "if it adopts a rate between one and three percent and explains its choice." *Pfeifer*, 462 U.S. at 548.  "Once the trial judge chooses a discount rate, he must 'apply it to *each* of the estimated annual installments, and then add up the discounted installments to compute the award." *McCarthy v. United States*, 870 F.2d 1499, 1502 (9th Cir. 1989) (citing *Shaw v. United States*, 741 F.2d 1202, 1207 (9th Cir.1984)).

In this case, the parties' experts agreed that a net discount rate can be determined by subtracting the inflation rate or wage growth rate from the interest rate that will be earned through investments in United States treasury bonds.  The parties' experts presented testimony on the interest rate, wage growth rate, and inflation rate that they used to calculate the net discount rates which was used to determine the present value of Brianna's damages.

### i. Interest Rate

Plaintiffs' economic expert, Robert Johnson, testified that when calculating the net discount rates he used a 4.5% interest rate, which is the "statistical average interest rate" of 90-day  U.S. government bonds from 1950 to 2014.  (ECF No. 91 at 23:3-10).

Johnson acknowledged that investing in a five-year treasury bond would "generally" yield a high rate of return, but he testified that a 90-day bond is better for flexibility and for adjusting to future inflation rates. *Id*. at 46:18-47:24. Johnson testified that if he were to purchase a longer-term bond, he would risk having to sell the bond before maturity in order to make a payment when it is due. Johnson testified that having to reinvest every 90 days for the rest of Brianna's life, more than 60 years, would not be a deterrent for investing in 90-day bonds because it does not cost anything to reinvest and "the average person can go down . . . and they can reinvest that money." *Id*. at 48:12-25.

Defendant's economic expert, Laura Dolan, testified that she used a 5.85% interest rate to calculate the net discount rates. Dolan testified that she determined the interest rate by looking at a combination of historical data, current data, and published forecast data on five-year treasury bonds. Dolan testified that when determining the interest rate, she gave "less weight" to the decade of the 1950's and 1960's and more weight "to the decades of the '70s, '80s, and '90s and 2000s." (ECF No. 94 at 68: 8-13). Dolan explained,

> I do not combine historical with current with forecast. That is not appropriate. I've looked at historical different time periods, and current and forecast as stand-alone items. I do give lesser weight to current interest rates because for a couple factors, one, Brianna's age. We have very long term calculations, so the interest rate that is available today is going to be quite different than what is going to be available over the next 60 years, so I do give much less weight to current data, as opposed to historical and forecasted.

*Id*. at 66:15-24. Dolan testified that five-year bonds are appropriate because of Brianna's young age and life expectancy of more than 60 years. Dolan testified that for "very long term calculations that continue out 60 plus years" she uses an "intermediate term government bond" rather than "the shortest which would be 90 days or the longest, 20 to 30 years." *Id*. at 18:5-10. Dolan testified that a five-year bond is considered "safe" and "secure." *Id*. at 10-14. Dolan testified that she was "not recommending all of the investment be made exclusively in five-year government bonds . . . I don't think

it is wise to invest 100% of your money in one instrument." *Id*. at 73: 6-10.

Plaintiffs contend that Dolan's opinions are not credible because she "did not document anywhere how much weight she was giving to each of the time periods considered in formulating the interest rate portion of her net discount rate." (ECF No. 108 at 32).   Defendant contends that the Court should not use Johnson's net discount rate because Johnson's "selection of the short-term treasury bonds inappropriately increases his present value calculations." (ECF No. 111 at 57).

The Court finds Dolan's testimony credible and persuasive.  A five-year bond is an intermediate bond that is "the best and safest investment[]." *See Jones & Laughlin Steel Corp.*, 462 U.S. at 537 ("The discount rate should be based on the rate of interest that would be earned on the best and safest investments." (Internal citations omitted.)). Dolan's method of using a combination of historical, current, and published forecast data for five-year bonds to calculate the interest rates is reliable. *See Trevino*, 804 F.2d at 1518 ("[W]e can base our estimates on long time periods that will diminish the effect of shorter aberrational periods."). Because of Brianna's young age and life expectancy of more than sixty years,[14] the Court finds it is reasonable to use five-year treasury bonds to determine the interest rate.  The Court concludes that based on the facts in this case, the proper interest rate for calculating the net discount rates is 5.85%.

### ii. Wage Growth

Johnson testified that he calculated the wage growth in the United States to be 4.1%. Johnson testified that he derived that number by calculating the average weekly earnings of private, nonagricultural industries from 1950 until 2014 in the United States. Subtracting the wage growth rate of 4.1% from the interest rate of 4.5%, Johnson calculated a 0.4% net discount rate, which he used to calculate the present value of a lost earning capacity award.

Dolan testified that she calculated the wage growth in the United States to be 3.1%.  Dolan testified that she derived that number by looking at "historical wage

---

[14] The Court discusses Brianna's life expectancy in detail in Section C.

increases based upon the US Census Bureau's data for women with associates of arts degrees" for the past 25 years. (ECF No. 94 at 35:4-5; 76:8-12). Dolan testified that she "compared that historical wage growth with historical yields on intermediate term government bonds . . . [and] looked at current data and published forecasted data." *Id.* at 35:4-8. Subtracting the wage growth rate of 3.1% from the interest rate of 5.85%, Dolan calculated a 2.75% net discount rate for a woman with an associates of arts degree. Dolan testified that for a woman with a bachelor's degrees, she used a net discount rate of 2.5%.

The Court finds Dolan's testimony credible and persuasive. The use of data from the United States Census Bureau for wage growth for women with a bachelor's degree[15] is more reasonable under the facts in this case than using wage growth for all private, nonagricultural industries. Brianna is female and could have received a bachelor's degree. The Court concludes that 2.5% is the proper net discount rate for calculating the present value of Brianna's loss earning capacity award.

### iii. Inflation Rates

To determine the inflation rate to be used in calculating the net discount rate for the lifecare plans, Johnson testified that he separated Plaintiffs' lifecare plan into two general components of inflation, one that tracked medical inflation and one that tracked non-medical inflation. To determine the inflation rate for medical care, Johnson testified that he relied on the medical consumer price index. Johnson testified that the global rate of inflation of all medical goods and services from 1950 to 2014 has averaged about 5.4% per year. Johnson testified that he calculated the inflation rates for the various medical components of the lifecare plan and determined that using that approach resulted in an inflation rate of 6.1%. Johnson testified that he used the lower rate of 5.4% when he calculated the net discount rate for medical inflation because it was a "more conservative" approach. (ECF No. 91 at 42:4-12). Subtracting the inflation rate of 5.4% from the interest rate of 4.5%, Johnson calculated a positive net

---

[15] The Court discusses Brianna's educational attainment in detail in section D.

discount rate of +0.9%. Johnson testified that because the rate of inflation is higher than the interest rate, the Court would need "to put more money in today because the rate of return is not going to be great enough to offset the inflationary. . . rate increase." *Id*. at 70:25-71:2.

To determine the net discount rate for future care costs for non-medical care, such as attendant care, conservator, fiduciary, and supported employment, Johnson testified that he relied on the Consumer Price Index for calculating inflation rate. Johnson calculated an inflation rate for non-medical expenses, including attendant care, of 3.7%. Subtracting the inflation rate of 3.7% from the interest rate of 4.5%, Johnson calculated a 0.8% net discount rate, which he used to calculate the present value of future care costs for non-medical care.

Dolan testified that she calculated several net discount rates for future care items based on the inflation rate for the specific category of care in the Defendant's lifecare plan. Dolan testified that it is more accurate to calculate several net discount rates for different categories of the services needed in the lifecare plan than to use fewer categories. Dolan testified that she used a 2.0% net discount rate for physician services, 0% net discount rate for emergency room admission, and 3.5% net discount rate for medical equipment supplies. Dolan explained that the difference in the net discount rate is based on the change in the increase of prices over time for example, "the price increases for ER admission is much higher on average than the price increases to acquire medical equipment and supplies, so the higher the growth the lower the net discount rate." (ECF No. 94 at 47:6-11). Dolan testified that she determined the expected growth in the various categories by looking at the different categories of the consumer price index. To determine the net discount rate for attendant care, Dolan used two sources—Home Care Salary & Benefits Report, a home care salary survey that measures price increases for agency-based, nonmedical caregivers that come to the home and Occupational Employment Statistics, a wage survey published by the Bureau of Labor that measures wage growth for home health and personal caregivers. Dolan

testified that the data from these sources shows that the wage growth for at-home caregivers is slower than inflation.  Dolan testified that for attendant care, she used a 3.0% net discount rate.  Dolan testified that although it would be "simpler" to use less categories of net discount rates, such as one for medical goods and another for non-medical items, "it certainly is not as accurate." *Id*. at 48:19-21.  Dolan testified that she analyzed "specific components" because she felt that "it is important to be as detailed and accurate as possible when doing these calculations . . . ." *Id*. at 48:23-25.

Plaintiffs contend that Dolan's reliance on the Home Care Salary & Benefits Report was not appropriate.  Plaintiffs note that Johnson testified that the report relies on national, rather than Southern California data, and only reflects data collected before 2012, which was before a new law went into effect on January 1, 2014 that required home care workers to be paid minimum wages and overtime, resulting in a 33-44% increase in the price of attendant care.

Defendant contends that the change in the law is "likely a one-time circumstance, and any future inflation of those wages can be expected to follow historical trends . . . ." (ECF No. 111 at 62).  Defendant asserts that "any increase in [attendant care] costs based on a change in federal law is . . . already factored into Defendant's economic analysis," noting that the costs for attendant care are higher in Defendant's lifecare plan than those provided by Plaintiffs' lifecare plan.  *Id*.  Defendant contends that Dolan's use of national rather than local statistics is consistent with "Johnson's use of the Consumer Price Index . . . [which] looks at an entire market of goods and services, like food, clothing, housing, energy, transportation." *Id*. at 60.

The Court finds Dolan's testimony is credible and persuasive.  Dolan's method of calculating the net discount rate based on the inflation rate of several different categories in the life care plan is more detailed and accurate than calculating the inflation rate of two categories.  There is evidence that there was a change in the law in January 1, 2014 requiring that home care workers be paid minimum wages and overtime, which resulted in an increase in the cost of attendant care.  There is evidence

1  that the change in the law was a one-time occurrence.  The parties' life care plans,
2  which were finalized in August and October 2014, include an estimate for cost of
3  attendant care that reflects the change in the law.  The Court concludes that it is
4  reasonable to expect that the cost of attendant care will increase at the historical  rate
5  of inflation.  The Court concludes that Dolan's reliance on Home Care Salary &
6  Benefits Report to calculate the inflation rate for attendant care was reasonable.  The
7  Court concludes that under the circumstances of this case the inflation rates calculated
8  by Dolan are the proper rates.

### iv. Conclusion

10      The Court concludes that the interest rate, wage growth rate, and inflation rates
11  calculated by Defendant's expert, Dolan are reasonable and the proper rates under the
12  circumstances of this case.  The net discount rates calculated by Dolan account for the
13  interest that Plaintiffs will receive on the damage award while assuring that Plaintiffs
14  will not be under-compensated by the effect of inflation.  *Pfeifer*, 462 U.S. at 537
15  ("However, the effects of inflation must be taken into account so as not to under-
16  compensate the plaintiff.").  The Court will use the net discount rates calculated by
17  Dolan to determine the present value of damages awarded to Plaintiffs. *See Pfeifer*, 462
18  U.S. at 549 (finding that a discount rate between 1% and 3% is presumptively
19  reasonable).

### C. Future Medical Expenses

21      Under California law, Brianna is entitled to recover  "objectively verifiable
22  monetary losses including medical expenses . . . . "  Cal. Civ. Code § 1431.2(b)(1).
23  "[D]amages which are speculative, remote, imaginary, contingent, or merely possible
24  cannot serve as a legal basis for recovery." *Frustuck*, 28 Cal. Rptr. at 371.

### i. Life Expectancy

26      Plaintiffs' pediatric neurology expert, Dr. William Weiss, M.D., testified that
27  he spends approximately two-thirds of his time supervising a research lab focused on
28  tumors of the nervous system, teaching, and applying for grants.  Dr. Weiss testified

that he spends approximately one-third of his time performing direct patient care. Weiss testified that determining life expectancy was not a significant portion of his medical training, his research, or his clinical practice.  Dr. Weiss, testified that he physically examined Brianna.  Dr. Weiss testified that Brianna's life expectancy was normal based on the fact that Brianna is ambulatory, has no seizures, and is not dependant on a tube for feeding.  Dr. Weiss testified that after reviewing Dr. Day's report in the case and the papers cited, he subtracted a year or two from Brianna's life expectancy because of her difficulty communicating.  Dr. Weiss testified that having attendant care would help mitigate Brianna's difficulty communicating.  Dr. Weiss also testified that Brianna had lower risk factors for early death, such as drug abuse or motor vehicle accidents.  Dr. Weiss testified that Brianna's life expectancy is 79 and a half years.

Defendant's expert, Dr. Steven Day, Ph.D. testified that he is a statistician specializing in epidemiology whose research focuses on mortality, survival, and life expectancy.  Dr. Day testified that he has published in peer-review journals, focusing on life expectancy and survival analysis in different populations of individuals, including those with developmental disabilities or brain injuries.  Dr. Day testified that he did not physically examine Brianna, but he reviewed her medical records.  Dr. Day testified that to determine the Brianna's life expectancy he relied on a number of different studies and the reports published in those studies, such as mortality tables for people with disabilities published by a government organization called the Pension Benefit Guaranty Corporation.   Dr. Day testified that the important factor in determining Brianna's life expectancy was her "level of intellectual disability." (ECF No. 110 at 50:2-7).  Dr. Day testified that many studies show that people with intellectual disabilities are more likely than the general public to die because of respiratory infections, digestive tract problems, and cancer.  Dr. Day testified that he used studies based on African-American females for the purposes of his calculations.  Dr. Day testified that he did not document the relative weight he gave to the risk factors

that were identified in each study; however, he testified that other epidemiological experts could "understand every step" that he took in coming to his opinion regardless of whether they agreed with his ultimate opinion. *Id*. at 44:1-4. Dr. Day testified that Brianna's life expectancy is 68.1 years.

Evidence at trial showed that Brianna is currently health, ambulatory, and has some self-feeding skills. The evidence showed that Brianna has not been hospitalized since 2010, that Brianna takes no medications, and that Brianna gets sick no more often than her two older brothers. Both experts testified that Brianna has a profound cognitive delay that will effect her life expectancy. The Court finds that Dr. Day's expertise in calculating life-expectancy credible and persuasive. Dr. Day's work mainly focuses on mortality, survival, and life expectancy whereas two-thirds of Dr. Weiss' work is focused on tumors of the nervous system. Initially, after examining Brianna, Dr. Weiss opined that Brianna would have a normal life expectancy. However, after reading Dr. Day's report, Dr. Weiss concluded that it was likely that Brianna would have a slightly lower life expectancy because of her cognitive delays. The Court finds Dr. Day's opinion that Brianna's inability to communicate will lower her life expectancy to be reasonable and persuasive. The Court concludes that the evidence at trial established life expectancy for Brianna of 68.1 years.

### ii. Life Care Plans

The Court was presented with extensive expert testimony regarding the future medical needs of Brianna. Experts for both parties prepared and submitted life care plans, which provide for the treatment and care that Brianna will need for the remainder of her life. The life care plans contain similar costs for Brianna's care needs and that "the main factor driving the differences in economic damage calculations is the economists' calculations of the present cash value of those costs." *See* ECF No. 111 at 54. Defendant contends, however, that the Court should use its life care plan because Plaintiffs' plan includes care that is not necessary. Specifically, Defendant disputes the amount requested in the following areas: physical therapy, occupation therapy, speech

therapy, physiatrist care, orthopedic care, orthotics, Botox, ophthalmologist, case management, counseling, acute hospitalizations, and  emergency room visits. Defendant also objects to the inclusion of supported employment, a classroom aid, and education advocate, in the life care plan.

The Court has reviewed the life care plan prepared by Plaintiffs' life care planner, Carol Hyland, and the life care plan prepared by Liz Holakiewicz, Defendant's life care planer.  The Court has considered the testimony regarding Brianna's future life care needs, as well as the testimony of expert witnesses concerning these issues.  The Court finds that the life care plans contain similar costs for Brianna's care and that both parties' experts were credible and reasonable.  Both parties' life care plans take into account the increase in cost for attendant care workers. The Court concludes that Plaintiffs have established by a preponderance of the evidence that all of the items in Plaintiffs' life care plan are medically reasonable and likely to be incurred for the future treatment of Brianna's injuries as caused by Defendant's negligence.

### iii. Conclusion

After reviewing all of the evidence at trial, the Court concludes that Plaintiffs' have proven by a preponderance of the evidence that Brianna is entitled to future care costs.  In determining the amount to award, the Court uses a life expectancy finding of 68.1 years of age and Plaintiffs' lifecare plan.  The Court applies  Defendant's net discount rates.  The Court concludes that the future care costs portion of Brianna's damages is $2,877,719.00.  *See* Exhibit 81A at 4.

### D. Lost Earning Capacity

California Civil Jury Instruction for Lost Earning Capacity provides, "To recover damages for the loss of the ability to earn money as a result of the injury, [name of plaintiff] must prove the reasonable value of that loss to [him/her].  It is not necessary that [he/she] have a work history."  CACI 3903D  "Loss of earning power is an element of general damages that may be inferred from the nature of the injury, with or without proof of actual earnings or income either before or after the injury.  The test is not what

1   the plaintiff would have earned in the future but what she could have earned." *Hilliard*

2   *v. A. H. Robins Co.*, 196 Cal. Rptr. 117, 142 (Ct. App. 1983).

3       California Civil Jury Instruction for Future Lost Earnings provides, "[To recover

4   damages for future lost earnings, [name of plaintiff] must prove the amount of [insert

5   one or more of the following: income/earnings/salary/wages] [he/she] will be

6   reasonably certain to lose in the future as a result of the injury.]" CACI 3903C.

7       Plaintiffs contend that Dolan's testimony is not credible because, on cross-

8   examination, Dolan defined future lost earning capacity as "the amount of money that

9   an individual is reasonably certain to earn . . . ." (ECF No. 108 at 33).  Plaintiffs

10  contend that "[t]he definition that Ms. Dolan testified to in Court as to lost earning

11  capacity was actually from the [jury] instruction regarding future lost earnings (CACI

12  3903C) which refers to earnings that the plaintiff 'will be reasonably certain to lose in

13  the future as a result of the injury." *Id*.

14      Defendant concedes that "Plaintiffs are correct that the phrase used by Ms. Dolan

15  more closely tracks CACI 3903C's definition of future lost wages than CACI 3903D's

16  definition of lost earning capacity . . . ." (ECF No. 111 at 63).  Defendant contends that

17  nevertheless, the Court should determine lost earning capacity damages based on

18  Dolan's analysis.

19      In this case, Plaintiff is entitled to recover for lost earnings capacity.  At trial,

20  Plaintiffs' expert, Johnson, testified that "lost earnings capacity is the amount of money

21  that a person would have had the capacity to make up to a set period in the workforce."

22  (ECF No. 91 at 61:1-3).  Defendant's expert, Dolan, testified that her "understanding

23  of lost earnings capacity reflects the amount of money that an individual is reasonably

24  certain to earn, and that is what I've calculated.  I haven't calculated possibilities.  I've

25  calculated reasonably certain probabilities."  (ECF No. 94 at 50:7-11).  While Dolan

26  claims to have calculated Brianna's future lost earning capacity, the Court finds that

27  Dolan testified that she used the amount of earnings that "an individual is reasonably

28  certain to earn," which is the definition for future lost earnings, not future lost earning

capacity. *See* CACI 3903C. After reviewing all of the evidence at trial, the Court concludes that Plaintiffs' have proven by a preponderance of the evidence that Brianna is entitled to future lost earnings. In determining the amount to award, the Court finds that the evidence supports Plaintiffs' analysis. The Court finds that Brianna could have attained a bachelor's degree, that Brianna could have received 21.6% fringe benefits, and that Brianna could have worked until she was 65 years old. The Court applies Defendant's net discount rate of 2.5% to determine the present value of Brianna's award. The Court concludes that Brianna is entitled to lost earning capacity damages in the amount of $1,401,879.00. *See* Exhibit 81B at 2.

### E. Offset for Past SSI Payments

At trial, Defendant presented evidence that Brianna Veasley received $21,583.00 in Supplemental Security Income ("SSI") between November 13, 2012 and November 1, 2015. Exhibit 80A at 6. Defendant contends that this amount "must be deducted from any judgment against the United States to avoid a double payment in violation of the waiver of sovereign immunity provided by the FTCA.

Plaintiff contends that although evidence of past SSI payment is admissible, nothing "mandates that the Plaintiffs' damages be reduced by the collateral source benefits." (ECF No. 112).

California Civil Code section 3333.1 creates a limited exception to the collateral source rule. It provides, in pertinent part,

> (a) In the event the defendant so elects, in an action for personal injury against a health care provider based upon professional negligence, he may introduce evidence of any amount payable as a benefit to the plaintiff as a result of the personal injury pursuant to the United States Social Security Act, any state or federal income disability or worker's compensation act, any health, sickness or income-disability insurance, accident insurance that provides health benefits or income-disability coverage, and any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost of medical, hospital, dental, or other health care services. Where the defendant elects to introduce such evidence, the plaintiff may introduce evidence of any amount which the plaintiff has paid or contributed to secure his right to any insurance benefits concerning which the defendant has introduced evidence.

Cal. Civ. Code § 3333.1. "[W]here the injured person is receiving injury-related

benefits payable from unfunded general revenues such benefits are to be deducted from any federal tort claims award." *United States v. Harue Hayashi*, 282 F.2d 599, 603 (9th Cir. 1960). "The theory is that to the extent of such benefits compensation is already being made from the same unfunded source drawn upon in paying the federal tort claims award." *Id*. There is "no indication that Congress meant the United States to pay twice for the same injury." *Brooks v. United States*, 337 U.S. 49, 53-54 (1949). SSI payments are financed from the general funds of the United States Treasury.

The Court concludes that past SSI payments paid to Plaintiffs are properly deducted from the damage award in order to avoid Defendant from paying twice. Brianna's damages shall be offset by $21,583.00.

### F. Non-Economic Damages

Section 1431.2(b)(2) of the California Civil Code states that "the term 'non-economic damages' means subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." Cal. Civ. Code § 1431.2(b)(2). Noneconomic damages may be awarded for the "emotional distress [that] arose from the 'abnormal event' of participating in a negligent delivery and reacting to the unexpected outcome of her pregnancy with resulting 'fright nervousness, grief, anxiety, worry, mortification, shock, humiliation and indignity, physical pain, or other similar distress.'" *Burgess v. Super. Ct.*, 831 P.2d 1197, 1209 (Cal. 1992). Noneconomic damages may not be awarded for "loss . . . of affection, society, companionship, love, and disruption of the 'normal' routine of life to care for [Brianna] . . . ." *Id*.

### i. Brianna Veasley

Plaintiffs request that the Court award $250,000, the maximum amount of non-economic damages permitted under California Civil Code Section 3333.2, to Brianna Veasley. Cal. Civ. Code § 3333.2 ("In no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000).").

Defendant concedes that "if the Court determines Brianna Veasley is entitled to noneconomic damages, the Court should award her $250,000." (ECF No. 111 at 82).

The Court concludes that based on the injuries, Brianna Veasley is entitled to recover noneconomic damages to compensate for pain, suffering, physical impairment and other nonpecuniary damages in the amount of $250,000.

### ii. Mildred Veasley

Plaintiffs request that the Court award $250,000 to Mildred Veasley.   At trial, Veasley testified that when Brianna was born she suffered "severe" pain. (ECF No. 102 at 15:1-4). Veasley testified that when Brianna was born she was terrified and did not know whether her daughter was going to survive.   Veasley testified that it was a "traumatic event." *Id*. at 20:1. Veasley testified that she talks to her family, friends, or pastor almost every day about what she went through giving birth to Brianna.   The Court concludes that Mildred Veasley is entitled to noneconomic damages in the amount of $250,000.

/ / /

/ / /

## VI. Conclusion

IT IS HEREBY ORDERED that Plaintiffs are entitled to judgment in their favor against the United States.  Plaintiffs are awarded the following damages:

Economic Damages

| | |
|---|---|
| Past Medical Expenses | $1,875.41 |
| Reasonable Value of Extraordinary Parental Care | $180,961.70 |
| Lost Earning Capacity | $1,401,879.00 |
| Future Care Costs | $2,877,719.00 |
| Offset for Past SSI | ($21,583.00) |
| **Total Economic Damages** | **$4,440,852.11** |

Noneconomic Damages

12-cv-3053-WQH-WVG

| | |
|---|---|
| Brianna Veasley | $250,000 |
| Mildred Veasley | $250,000 |
| **Total Noneconomic Damages** | **$500,000** |

IT IS FURTHER ORDERED that the parties shall submit a joint status report by September 1, 2016.  The Court will conduct a status conference on September 8, 2016 at 9:30 A.M. in Courtroom 14B.

DATED:  August 12, 2016

**WILLIAM Q. HAYES**
United States District Judge